IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHRISTOPHER PROESCHER,

                Plaintiff,

    v.                                   1:12-cv-1459-WSD

ADAM BELL,
and
RODNEY DANTZLER,

                Defendants.

<u>OPINION AND ORDER</u>

      This matter is before the Court on Defendants Adam Bell and Rodney

Dantzler's Motion for Summary Judgment (the "Motion for Summary Judgment")

[40].

## I.    BACKGROUND

      On April 27, 2012, Plaintiff initiated this action against the Defendants

under 42 U.S.C. § 1983, seeking "damages for the illegal detention, search, and

arrest of Plaintiff, as well as the seizure of Plaintiff's personal property" during an

April 20, 2012, encounter at Gary Pirkle Park in Gwinnett County, Georgia.[1] [26,

---

[1] On September 21, 2012, Plaintiff dismissed Hanna from this action, leaving only
Bell and Dantzler as defendants. [37].

¶¶ 1, 76].  Plaintiff also seeks a declaratory judgment that he "may not be ejected from Gary Pirkle Park while using such park for the purposes for which it is dedicated" and that he "may not be lawfully detained for carrying a firearm in a place where the carriage of firearms is not prohibited."  [Id. ¶¶ 1, 77].  On July 10, 2012, Plaintiff amended his complaint to add a malicious-prosecution claim under Georgia state law (the "Amended Complaint") [26].

A.    Factual Background

Paul Reid Hanna ("Hanna") was employed as a private security officer by Plaza Security, LLC.  In this capacity, Hanna performs security-related functions for the City of Sugar Hill, including the patrol of Gary Pirkle Park (the "Park").  Hanna is required to investigate suspicious persons and activities.  [42, ¶¶ 5-6; 47-1, ¶¶ 5-6].  The Gwinnett Police Department is the law-enforcement agency that Hanna called for help in unusual situations.  Hanna called the police department once a week.   [52, 17:10-12, 26:13-27:1].

On April 20, 2012, Hanna was patrolling the parking lot of the Park when he saw Plaintiff Christopher Proescher ("Plaintiff" or "Proescher") walking on a walking path that circles the main parking area of the Park.  Hanna saw a gun holster on Plaintiff's hip and assumed that there was a firearm in it.  [42, ¶¶ 8-9; 47-1, ¶¶ 8-9].  Nearby was a children's playground.  [52, 92:22-93:8].

2

Hanna observed Plaintiff's dress.  Instead of clothing normally worn by walkers who exercise in the park, Plaintiff wore black boots, black socks and what looked to Hanna like a camouflage uniform.  [52, 35:3‑39:14].  Plaintiff was walking at a fast, determined, agitated pace.  [52, 68:8-68:16].

Hanna called the Gwinnett County police dispatcher and reported that there was in the Park a person wearing military boots and black socks.  Hanna further described the top and bottom of Plaintiff's clothing, and reported that the person was carrying a gun.  Hanna asked whether any county ordinance or Georgia law prohibited the carrying of a firearm in the Park.  [52, 37:19-40:3].  The dispatcher responded by asking whether Hanna needed a Gwinnett County police officer at the scene.  Hanna responded that he did.  [52, 40:9-40:18].

Defendant Bell ("Bell") is a Gwinnett County police officer.  [50, 4:13:4:16].  On April 27, 2012, he received a dispatcher's radio call stating that a suspicious person was at Gary Pirkle Park, near a playground, carrying a gun out in the open.  Bell was told that a security officer had called in to report the suspicious person.  [50, 12:2-13:23].

When Bell arrived at the Park, he saw Plaintiff standing next to a security guard inside the Park.  Plaintiff was talking on a cell phone.  [50, 15:4-15:9].  Bell identified himself to Plaintiff and asked for Plaintiff's identification.  Plaintiff

3

interrupted his phone conversation and asked if he was under detention.  Bell

responded that he was.  Bell then requested that Plaintiff hang up the phone, and

Plaintiff complied.  [50, 15:19-16:12].

Bell detained Plaintiff because he had observed that Plaintiff was carrying a

sidearm or firearm on his "left hip,"[2] and was concerned for the safety of the

people in the Park and for his own safety.  Bell needed to identify Plaintiff to see

whether Plaintiff was authorized to carry a firearm.  Bell also wanted to find out

why Plaintiff was at the Park.  [50, 16:11-16:21].

Bell and Plaintiff walked to Bell's patrol truck, which was about 15 yards

from where they were standing.  [50, 18:1-18:9].  Bell asked if Plaintiff had other

weapons.  Plaintiff responded that he did not.  Bell had Plaintiff place his hands on

the bed cover of the truck and then asked Plaintiff for permission to pat him down.

Plaintiff did not object.  Bell removed the firearm on Plaintiff's hip and unloaded a

round that was inside the chamber.  Bell laid the firearm on the back of his truck.

He patted Plaintiff down and felt a fully-loaded ammunition magazine in Plaintiff's

left pants pocket.  Bell removed the magazine and also placed it on the back of the

truck.  [50, 18:1-19:5].

---

[2] The record indicates that the gun was carried in a holster.  [47-1 ¶ 2; 47-3, at 6].

4

Bell asked if Plaintiff had any identification, specifically asking to see Plaintiff's driver's license.  Plaintiff responded by presenting a Georgia weapons permit that contained a name, date of birth and fingerprint, but which did not have a photograph.  As a result, Bell could not confirm Plaintiff's identity.  [50, 19:15-20:24, 36:16-36:25].  Bell asked Plaintiff why he was at the Park.  Plaintiff responded that he was exercising.  [50, 20:25-21:2].[3]

Defendant Dantzler ("Dantzler"), another Gwinnett County police officer then arrived at the Park as a backup.   [50, 23:19-23:21].  Bell gave Dantzler a quick briefing on what had occurred, and Dantzler ran the serial number on Plaintiff's firearm through a database to determine if it was stolen.  [51, 11:2-12:9, 17:24-22:25].  Plaintiff stated that he did not consent to a "search" of his weapon. Bell told Plaintiff that Dantzler was running the serial number to determine if it had been reported stolen.  [50, 23:22-24:5].  The database search indicated that the gun was not stolen.  [51, 17:24-22:25].

Bell continued to ask Plaintiff for a form of identification that contained Plaintiff's photo.  [50, 36:16-36:25].  In response, Plaintiff gave confusing information about his birthday and evaded requests for his driver's license,

---

[3] At this point, Bell asked Plaintiff if he had driven to the Park, to which Plaintiff replied that he was exercising and then asked what laws he was breaking.  Bell told him that he was carrying a gun in a county park.  [50, 21:6-22:20].

including by chatting about dogwood leaves and Bell's legs and eyes.  [50, 32:11-32:18, 38:24-38:25].  When specifically asked to provide his license, Plaintiff stated that he had "a license for whatever he [needed] a license for."  [50, 37:11-37:21]

Corporal Kimsey ("Kimsey"), Bell's immediate supervisor, next arrived on the scene and spoke to Hanna.  [50, 40:15-41:6].  After learning that Hanna had asked Plaintiff to leave the Park and that Plaintiff had refused, Kimsey called the magistrate judge to determine whether an arrest of Plaintiff could be made.  The magistrate judge replied that there was enough probable cause to arrest.  [50, 41:19-43:3].  Kimsey then walked to Bell and told him that there was probable cause to arrest Plaintiff for criminal trespass.  Kimsey explained that Hanna had asked Plaintiff to leave the Park, but Plaintiff had declined.  Kimsey also told Bell that a magistrate judge had confirmed over the phone that there was enough probable cause to arrest Plaintiff for criminal trespass.  [Id.].

Bell ultimately filled out an affidavit of criminal trespass and arrested Plaintiff.  Bell handcuffed and searched Plaintiff.  During the search, Bell discovered that Plaintiff had possession of a tape-recorder and determined that it

had been recording Plaintiff's encounter with Hanna, Bell, Dantzler and Kimsey.

[50, 45:20-46:16].[4,5,6]

    B.   Procedural History

    Bell and Dantzler move for summary judgment on Plaintiff's § 1983 claim

on the ground that Plaintiff has not asserted cognizable claims that his

constitutional rights were violated.  Even if Plaintiff did, Defendants argue that (i)

Plaintiff has not asserted a cognizable claim against Gwinnett County based on any

policy or conscious disregard by the county, and (ii) Bell and Dantzler are entitled

to qualified immunity.  Finally, Defendants claim that summary judgment is

required to be granted on Plaintiff's malicious-prosecution claim because they did

---

[4] In the affidavit, Bell stated that Plaintiff had entered the Park when told not to do so rather than that Plaintiff remained in the Park after being told to leave.  Bell believed that the code section cited in the preprinted affidavit criminalized refusal to leave after being instructed to do so, and therefore mistakenly believed that the affidavit cited the proper basis for the arrest.  [50, 50:9-53:20].

[5] In accordance with Gwinnett County's policy, Plaintiff's car was impounded to secure it.  [50, 47:4-47:18].

[6] On May 17, 2012, the Solicitor-General of Gwinnett County filed an accusation against Plaintiff in the State Court of Gwinnett County, charging Plaintiff with criminal trespass in violation of O.C.G.A. 16-7-21-(b)(2).  [47-2, ¶ 34; 48, ¶ 34].  On June 29, 2012, the Solicitor-General of Gwinnett County moved the state court to enter an order of *nolle prosequi* for "insufficient evidence to prove guilt beyond a reasonable doubt."  The Solicitor-General stated a further reason that "Defendant ha[d] [a] valid weapon carry license."  On the same date, the State Court of Gwinnett County entered the order of *nolle prosequi* terminating the criminal case against Plaintiff.  [47-3, at 8].

not act maliciously or without authority of law.  The Court begins by analyzing

Plaintiff's §1983 claims, the capacity in which Defendants are alleged to have

acted, and whether they are entitled to qualified immunity.

## II.   DISCUSSION

### A.   Legal Standard

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is

genuinely disputed must support that assertion by . . . citing to particular parts of

materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other

materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the

absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock

Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this

burden, the non-movant must demonstrate that summary judgment is inappropriate

by designating specific facts showing a genuine issue for trial.  Graham v. State

Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties

"need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Analysis

1. *The § 1983 claim*

While not a source of substantive rights, § 1983 provides a method for vindicating federal rights conferred by the Constitution and federal

statutes.[7]  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  To prevail in an action under § 1983, a plaintiff must show "that the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States."  Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992); accord Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993).  The parties do not dispute that Defendants were acting under color of state law during the events that give rise to this action.  [26, ¶¶ 12, 14; 27, ¶¶ 12, 14].  The question is whether Defendants "deprived [Plaintiff] of rights, privileges, or immunities" secured by the United States Constitution. Plaintiff makes several arguments why his rights were violated.  Plaintiff argues that his First Amendment right to free speech, Second Amendment right to bear arms, and Fourth Amendment right against unwarranted search and seizure were violated.

---

[7] 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

i.  Failure to state an official-capacity claim

"[A] judgment against a public servant in his official capacity imposes liability on the entity that he represents . . . [if] the public entity received notice and an opportunity to respond." Brandon v. Holt, 469 U.S. 464, 471-72 (1985) (suit against the director of a city police department in his official capacity); Moore v. Morgan, 922 F.2d 1553, 1556 (11th Cir. 1991) (suit against county commissioners in their official capacity);[8] see also Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."); Kentucky v. Graham, 473 U. S. 159, 166 (1985).  "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law."  Hafer, 502 U.S. at 25 (internal quotation marks omitted) (citing Graham, 473 U.S. at 166; Monell v. New York City Dept. of Soc. Servs., 436 U. S. 658, 694 (1978)).

The Supreme Court has placed "strict limitations on municipal liability" under § 1983.  "There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers."  Gold v. Miami, 151 F.3d

---

[8] Attorneys of the Gwinnett County Department of Law filed Defendants' Motion for Summary Judgment and are representing them in this action.  The Court finds that the notice requirement is met.

1346, 1350 (11th Cir. 1998) (citing <u>Monell</u>, 436 U.S. at 691).  A municipality may be held liable for the actions of a police officer only when a plaintiff identifies a "municipal policy or custom that caused" the alleged injury.  <u>Id.</u>; <u>accord</u> <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997); <u>Canton v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Monell</u>, 436 U.S. at 694.  A plaintiff seeking to establish municipal liability based on the conduct of its officials "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice."  <u>Brown</u>, 520 U.S. at 407 (citing <u>Canton</u>, 489 U.S. at 388).  "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  <u>Brown</u>, 520 U.S. at 405.

To establish a "deliberate or conscious choice" or "deliberate indifference," a plaintiff "must present some evidence that the municipality knew of a need to train [or] supervise in a particular area and the municipality made a deliberate choice not to take any action."  <u>Gold</u>, 151 F.3d at 1350; <u>see</u> <u>Young v. Augusta</u>, 59 F.3d 1160, 1171-72 (11th Cir.1995); <u>Church v. Huntsville</u>, 30 F.3d 1332, 1342-46 (11th Cir.1994); <u>Wright v. Sheppard</u>, 919 F.2d 665, 674 (11th Cir.1990); <u>Kerr v. W. Palm Beach</u>, 875 F.2d 1546, 1556-57 (11th Cir.1989).  "This high standard of

proof is intentionally onerous for plaintiffs."  Gold, 151 F.3d at 1351 n.10.

"[P]ermitting cases against cities for their 'failure to train employees' to go

forward under § 1983 on a lesser standard of fault would result in *de facto*

respondeat superior liability on municipalities."  Canton, 489 U.S at 391-92.  The

Eleventh Circuit "repeatedly has held that without notice of a need to train or

supervise in a particular area, a municipality is not liable as a matter of law for any

failure to train and supervise."  Gold, 151 F.3d at 1351.

Plaintiff bases his official-capacity claim on a single instance of detention,

search, and arrest of Plaintiff by Bell at the Park.  He alleges no evidence of prior

incidents involving the same alleged constitutional injury other than Bell's

statement at a deposition that it would "be a fairly standard practice" for him to

detain "armed citizen[s]" to "check their ID[s]" in his "[t]hirteen years of being a

law-enforcement officer in Georgia."  [47, at 24; 50, 17:7-17:23].  The Court is not

convinced that Bell's "standard practice" violated Plaintiff's constitutional rights

during their encounter at the Park.  Even if it did, the Court cannot find that

Gwinnett County acted with "deliberate indifference" toward Bell's action and

their "known or obvious consequences."  See Brown, 520 U.S. at 407.  Plaintiff

has not alleged that Gwinnett County received any "notice of a need to train or

supervise" its police officers regarding the practice of detaining armed citizens for

identifications, and the official-capacity claim is required to be dismissed.  <u>See</u>

<u>Gold</u>, 151 F.3d at 1351.

        ii.  Failure to state individual-capacity claims and qualified
             immunity

Plaintiff appears to allege that Bell and Dantzler are personally liable for the

encounter in the Park and specifically for an alleged violation of Plaintiff's First

Amendment right to free speech, Second Amendment right to bear arms, and

Fourth Amendment right to be free of illegal detention.  Defendants assert that they

are not subject to suit in their individual capacity because they are shielded from

personal liability by qualified immunity.

Qualified immunity protects government officials who perform discretionary

functions from suits in their individual capacities, unless their conduct violates

"clearly established statutory or constitutional rights of which a reasonable person

would have known."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (quoting <u>Harlow v.</u>

<u>Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "The purpose of this immunity is to allow

government officials to carry out their discretionary duties without the fear of

personal liability or harassing litigation, protecting from suit all but the plainly

incompetent or one who is knowingly violating the federal law."  <u>Lee v. Ferraro</u>,

284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations

omitted).  "A government official who is sued under § 1983 may seek summary

judgment on the ground that he is entitled to qualified immunity." Benton v. Hopkins, 190 F. App'x 856, 858 (11th Cir. 2006).  Plaintiff argues that Defendants, in their individual capacity, are not entitled to qualified immunity because Defendants "have not made the requisite showing that they were acting within their discretion."

To be protected by qualified immunity, "the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotation marks omitted).  A public official acts within the scope of his discretionary authority where the acts complained of were "undertaken pursuant to the performance of his duties" and "within the scope of his authority." See Rich v. Dollar, 841 F.2d 1558, 1564-65 (11th Cir. 1988); see also Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Rich, 841 F.2d at 1564-65.

The record here indisputably supports that Bell and Dantzler detained, searched, and arrested Plaintiff in the performance of their official duties as Gwinnett County police officers.  They encountered Plaintiff when they responded to a dispatcher's report of a suspicious person in the Park.  The report originated

from a security guard who was patrolling the Park.  When Bell arrived at the Park and approached Plaintiff, he did so as a law-enforcement officer responding to a report of suspicious activity, including the presence in the Park of a person who was reported to have a visible weapon and who in fact had a weapon on his person. The weapon was discovered to be loaded and Plaintiff had in his pocket an additional magazine loaded with ammunition.  Plaintiff was evasive in response to questions by Bell, declining to produce, as requested, identification bearing his photograph.  The facts all support that beginning with the response to the dispatch, Bell and Dantzler enngaged in traditional, ordinary, discretionary actions expected of law-enforcement officials.  They were authorized, in the execution of their duties as police officers, to arrest Plaintiff based on what they reasonably believed was a probable cause to arrest.  See Kingsland, 382 F.3d at 1232 ("[I]t is undisputed that [defendant officers] were acting within the course and scope of their discretionary authority when they arrested [plaintiff]"); Wood, 323 F.3d at 877.

The record shows that Defendants were acting in their discretionary authority as law-enforcement officers and that the burden shifts to Plaintiff to show that qualified immunity is not appropriate.  See Rich, 841 F.2d at 1564-65. Plaintiff fails to meet this burden.

Plaintiff first tries to meet the burden by arguing that qualified immunity does not apply to Defendants' exercise of their duties because Defendants violated Plaintiff's Fourth Amendment rights by "fail[ing] to suggest" or articulate "what crim[es] they suspected Plaintiff" of committing during their encounter with Plaintiff.  [47, at 25-26].  The argument is unconvincing.

The Supreme Court has set forth a two-part test for determining whether constitutional violations deprive Defendants of their qualified immunity.  "The threshold inquiry . . . is whether [P]laintiff's allegations, if true, establish a constitutional violation."  Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (quoting Hope, 536 U.S. at 736) (internal quotation marks omitted).  If a constitutional violation occurred, the Court must then determine whether "the right violated was clearly established."  Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009).  A determination of whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable state actor that his conduct was unlawful in the situation he confronted."  Id. at 202.   "If the law did not put the officer on

notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."   Id.   No reasonable police officer could have considered the detention or later arrest and search of Plaintiff as violating Plaintiff's asserted constitutional rights.[9]

A police detention constitutes a seizure under the Fourth Amendment.  See Terry v. Ohio, 392 U.S. 1, 16-19 (1968).  A person is seized under the Fourth Amendment when a police officer, by means of intentional physical force or show of authority, terminates or restrains a person's freedom of movement.  Brendlin v. California, 551 U.S. 249, 254 (2007); Florida v. Bostick, 501 U.S. 429, 434 (1991); Brower v. County of Inyo, 489 U.S. 593, 597 (1989); Terry, 392 U.S. at 19 n.16; Chandler v. Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir. 2012).  A police officer may make a seizure by a show of authority and without the use of physical force, but a seizure by a show of authority requires actual submission of the person being seized.  Brendlin, 551 U.S. at 254 (citing California v.

---

[9] Plaintiff did not in his response to Defendants' motion for summary judgment assert or argue that Defendants' conduct violated Plaintiff's First or Second Amendment rights.  Assuming that Plaintiff intended to assert these arguments in this litigation, the Court deems the arguments abandoned.  Plaintiff also failed to make a *prima facie* showing that he was detained, investigated, and arrested for exercising his First Amendment rights.  The First Amendment protects not only "pure speech," but also "expressive conduct."  See United States v. O'Brien, 391 U.S. 367, 376-77 (1968); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1270 (11th Cir. 2004).  The record does not support that Plaintiff was exercising any First Amendment right when Bell detained him.

Hodari, 499 U.S. 621, 626, n.2 (1991)); United States v. House, 684 F.3d 1173, 1199 (11th Cir. 2012).

The Court assumes that Plaintiff was detained shortly after Bell arrived at the Park when Bell, in response to Plaintiff's question whether he was being detained, stated that he was.  Plaintiff argues that when this detention occurred, Bell did not have a reasonable suspicion to detain.  The record discredits the argument, and the undisputed evidence is that a reasonable police officer would have believed there was sufficient reasonable suspicion to detain.

It is well-established under the Fourth Amendment that a law-enforcement officer may briefly detain and conduct a limited search of a person if the officer has, based on the totality of the circumstances, a "reasonable suspicion" that the Defendant has engaged or is about to engage in a crime. United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also Terry, 392 U.S. at 30-31.  There are no precise limits to the reasonableness inquiry. "Th[e] test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion."  United States v. Hensley, 469 U.S. 221, 228 (1985).

"In justifying such an intrusion, the 'reasonableness' standard requires that a police officer be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (internal quotation marks omitted).

"Although an individual may ultimately be engaged in conduct that is perfectly lawful . . . officers may 'detain the individual[] to resolve the ambiguity.'"  United States v. Lewis, 674 F.3d 1298, 1304 (11th Cir. 2012) (finding that the police had reasonable suspicion to detain and search individuals who admitted to carrying a concealed weapon during a consensual encounter, even though one of them carried a valid concealed-weapon permit).  Officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (finding that the border patrol had reasonable suspicion to stop and search a vehicle when the driver slowed down upon seeing an officer, stiffened his posture, and failed to acknowledge the officer).  "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may briefly stop the suspicious

person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions.  Terry, 392 U.S. at 30.

The totality of the circumstances here and the reasonable inferences from the facts support the existence of a reasonable suspicion.  Bell was advised by a police dispatcher that a security guard had reported a suspicious person in the Park who was "carrying a gun out in the open" as he walked near a playground, who, when Bell arrived at the Park, did have a visible weapon, and who evaded Bell's questions and requests for identification bearing a photograph, provided more than a sufficient basis constitutionally to detain Plaintiff.  See Adams v. Williams, 407 U.S. 143, 146-47 (1972) ("Reasonable cause for a stop and frisk" may arise through "information supplied.");  United States v. Herrera, 711 F. 2d 1546, 1555 (11th Cir. 1983).[10,11]  The Court finds, under a totality of the circumstances, that

_____

[10] Plaintiff relies on Florida v. J.L., 529 U.S. 266 (2000), to support that Bell could not rely on the dispatcher's report as a basis for his reasonable suspicion to detain Plaintiff.  [47, at 14].  In J.L., "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  Id. at 268.  The Supreme Court found that the officer's suspicion "arose not from any observations of their own but solely from a call made from an unknown location from an unknown caller," and thus the tip "lacked the moderate indicia of reliability" to support a reasonable suspicion for police detention.  Id. at 270-71.  J.L. does not apply here where the report came from a security guard, through a dispatcher, and Bell, upon arrival at the Park, confirmed that Plaintiff had a weapon.   See Alabama v. White, 496 U.S. 325, 331-32 (1990); United States v. Lindsey, 482 F. 3d 1285, 1291 (11th Cir. 2007).  Bell's independent observations entitled Bell to detain Plaintiff to determine whether

Bell had a reasonable suspicion to detain.  See Arvizu, 534 U.S. at 273; White, 496 U.S. at 331-32; Adams, 407 U.S. at 146; Lewis, 674 F.3d at 1304; Lindsey, 482 F.3d at 1291; Briggman, 931 F.2d at 709; Herrera, 711 F.2d at 1555.

Plaintiff next argues that Dantzler violated Plaintiff's Fourth Amendment rights by seizing Plaintiff's firearm to "check if it was stolen" without "provid[ing] any basis, reasonable or otherwise, to believe Plaintiff's firearm might be stolen." Absent any articulable suspicion of crime, Plaintiff argues, "the search of a firearm to see if it is stolen is unconstitutional" under the Fourth Amendment and the Fourteenth Amendment.  [47, at 26].  The Court disagrees.  The undisputed facts support that Dantzler took possession of the firearm to run a weapons check.

---

Plaintiff was authorized to carry the firearm.  See Lindsey, 482 F. 3d at 1291; United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991) (finding that detention was reasonable when the officer limited the detention to a request for driver's license and an explanation of detainee's presence at the location where detention occurred, and the detainee did not produce a driver's license and gave unsatisfactory answers to officer's questions).

[11] Plaintiff also argues that Delaware v. Prouse, 440 U.S. 648, (1979), applies.  In Prouse, a patrolman stopped an automobile without observing traffic or equipment violations or any suspicious activity.  The stop was made only to check the driver's license and registration.  The stop here was not an arbitrary stop to look for Plaintiff's license information.  "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."  Adams v. Williams, 407 U.S. 143, 146 (1972); United States v. Briggman, 931 F.2d 705, 709 (11th Cir. 1991).

Dantzler was serving as a backup to Bell and took possession of the gun as a safety precaution, including by establishing whether the gun was stolen.  [47, at 23, 25].

After lawfully detaining Plaintiff, Bell was constitutionally authorized to determine whether the gun was stolen.  See Lewis, 674 F.3d at 1305; Lindsey, 482 F.3d at 1288-91; Briggman, 931 F.2d at 709.  It was inconsequential that Plaintiff's "firearm possession ultimately turned out to be lawful," because "the officer did not know that [Plaintiff] lawfully possessed his firearm at the time of the detention."  Lewis, 674 F.3d at 1305.

Bell testified that Plaintiff gave evasive and confusing answers during the detention, creating concerns about Plaintiff's mental stability and the safety of others at the Park because Plaintiff was reported by the security officer to be next to a playground at one point while carrying a firearm.  [50, 32:14-32:20, 37:24-40:7, 23:2-23:11].  Bell wanted to determine if Plaintiff "was authorized to carry the weapon for [Plaintiff's] safety and the other people's safety" at the Park. [50, 23:2-23:11].  A records check to establish that the gun was not stolen was reasonable given those facts.  See Lewis, 674 F.3d at 1305; Lindsey, 482 F.3d at 1288-91; Briggman, 931 F.2d at 709.

Dantzler, who responded to assist Bell and who performed his duty to protect Bell's safety as a backup officer, conducted the records check on Bell's

behalf.  [51, 16:2-17:20].  As the backup officer, Dantzler was allowed to conduct the weapons check.  See United States v. Cure, 996 F.2d 1136, 1137 (11th Cir. 1993) (permitting a backup officer to retrieve a firearm from the back of a car and run a computer check during an investigatory stop to determine whether the firearm had been stolen).  Plaintiff's Fourth Amendment rights were not violated when Dantzler conducted a records check of the firearm to determine whether Plaintiff's weapon was stolen.

Plaintiff next argues that Bell lacked probable cause to arrest Plaintiff because "Bell did not have information in his possession that amounted to probable cause that Plaintiff had committed a crime."  Plaintiff appears to argue that Bell could not have had probable cause to arrest unless it was actually illegal to possess a firearm in the Park, which would justify Hanna's directive that Plaintiff leave the Park.

In Georgia, "[a] person commits the offense of criminal trespass when he or she knowingly and without authority . . . [r]emains upon the land or premises of another person . . . after receiving notice from . . . an authorized representative of the owner or rightful occupant to depart."[12]  O.C.G.A. § 16-7-21(b)(3).  Probable cause exists for an arrest for violation of § 16-7-21(b)(3) "if the arresting officer

---

[12] O.C.G.A. § 16-1-3(12) defines a "person," as used in Title 16 of the Georgia Code, to include a "government."

has knowledge and reasonably trustworthy information about facts and

circumstances sufficient for a prudent person to believe the accused has committed

an offense." Patterson v. State, 559 S.E.2d 472, 475 (Ga. 2002) (citing Johnson v.

State, S.E.2d 396 (Ga. 1988)).  "[T]he quantum of proof necessary to establish

probable cause is not that level which is necessary for proof of guilt in a trial."

Bradford v. State, 256 S.E.2d 84, 85 (Ga. App. 1979) (citing Draper v. United

States, 358 U.S. 307, 311-12 (1959)).  "The test of probable cause is whether it

would justify a person of reasonable caution in believing that an offense has been

or is being committed, and this requires probability, which is less than a certainty

but more than mere suspicion or possibility."  Lewis v. State, 335 S.E.2d 560,

562-63 (Ga. 1985).

    "Hearsay statements may serve as the foundation for probable cause" if

"verified by on site verification."  Bradford, 256 S.E.2d at 85.  "[T]o have a

substantial basis for making a probable cause determination, the police do not need

to corroborate the criminal activity.  A finding of probable cause requires only a

probability of criminal activity, not an actual showing of such activity"  United

States v. Deering, 296 F. App'x 894, 899 (11th Cir. 2008) (citations omitted)

(internal punctuation marks omitted); United States v. Brundidge, 170 F.3d 1350,

1353 (11th Cir. 1999); United States v. Sorrells, 714 F.2d 1522, 1528-29 (11th Cir.

1983) (holding that the credibility of an affiant may arise from an existing relationship and prior history).

Plaintiff argues that Bell lacked probable cause to arrest him, without a warrant, for criminal trespass because, at the time of the rest, Bell failed to investigate whether Hanna had the authority to eject Plaintiff and whether Hanna's reasons for ejecting Plaintiff complied with Georgia law and the Constitution.  This argument is without merit.

An arresting officer for criminal trespass is not required to make a final legal determination of whether or not an arrestee has the authority to enter or remain on the premise.  See Patterson, 559 S.E.2d at 475 (finding probable cause for criminal trespass when the arrestee admitted to being on premise, and an employee provided a statement of previous warning to leave); Lewis, 712 S.E.2d at 94-95 (finding probable cause for criminal trespass when the arresting officer relied solely on statements provided by the hotel staff that the arrestee refused to leave, even though the arrestee had complied with the staff's request to return to his suite); United Baptist Church, Inc. v. Holmes, 500 S.E.2d 653, 655-56 (Ga. Ct. App. 1998) (holding that the arresting police officer was not required to investigate whether a pastor was validly terminated and whether the pastor retained the right to return to church premises before arresting him for criminal trespass).

The arresting officer only needs to have "reasonably trustworthy information about facts and circumstances sufficient for a prudent person to believe [that] the accused has committed an offense."  Patterson, 559 S.E.2d at 475.  Bell testified that he believed Hanna to have the "authority" to eject Plaintiff: "He's employed by the City of Sugar Hill.  He has authority.  He's a representative agent of the property."  [50, 44:8-44:17].  The record also shows that Bell decided to arrest Plaintiff after Bell's supervisor, Corporal Kimsey, informed Bell that there was "enough probable cause" to "place [Plaintiff] under arrest" for "a criminal trespass."  Kimsey told Bell that Hanna was filling out a "written statement" attesting to Hanna's having asked Plaintiff "to leave twice."  [50, 40:17-40:23, 45:13-46:2].  Kimsey told Bell that Kimsey "had called the magistrate, explained the situation to the magistrate," and received confirmation from the magistrate that Bell "had enough to arrest for criminal trespass."  [50, 40:17-43:5].

Based on information provided by Kimsey, Bell's belief that Hanna had the authority to eject Plaintiff, and Bell's independent observation of Plaintiff during the investigatory detention, Bell had the requisite probable cause to arrest Plaintiff. See Deering, 296 F. App'x at 899; Brundidge, 170 F.3d at 1353; Sorrells, 714 F.2d at 1528-29; Patterson, 559 S.E.2d at 475; Lewis, 335 S.E.2d at 562-63; Bradford, 256 S.E.2d at 85.

27

The Court determines that Defendants are not liable under 42 U.S.C. § 1983 in their detention, search and arrest of Plaintiff in the course of their investigation at the Park.  Defendants' Motion for Summary Judgment with respect to the § 1983 claim is required to be granted.

### 2.  *The malicious-prosecution claim under O.C.G.A. § 51-7-40 against Bell and Dantzler*

Finally, Plaintiff argues that Bell violated O.C.G.A. § 51-7-40 because Bell "knew at the time he signed" an affidavit under oath that the affidavit "contained statements that were not true."  [47, at 21]. Under Georgia law, "[a] criminal prosecution which is carried on maliciously and without any probable cause and which causes damage to the person prosecuted shall give him a cause of action."[13] O.C.G.A. § 51-7-40.

A malicious prosecution under O.C.G.A. § 51-7-40 requires a plaintiff to prove the following elements: "(1) a criminal prosecution; (2) instigated without probable cause; (3) with malice; (4) pursuant to a valid warrant, accusation, or summons; (5) that terminated in the plaintiff's favor; and (6) caused the plaintiff damage.  McNeely v. Home Depot, Inc., 621 S.E. 2d 473, 474-75 (Ga. Ct. App. 2005) (citations omitted).

---

[13] "If a presentment is made at the instigation of a third person, from malice on his part and without probable cause, he shall be liable to an action for malicious prosecution just as if he were named as prosecutor."  O.C.G.A. § 51-7-46(b).

"Malice" in a claim for malicious prosecution under Georgia law means "personal spite" or "a general disregard of the right consideration of mankind," which is "directed by chance against the individual injured." Vojnovic v. Brants, 612 S.E. 2d 62, 625 (Ga. Ct. App. 2005) (citing Ashmore v. Foster, 561 S.E.2d 228, 231 (2002)).  "Malice may be inferred in the absence of probable cause." Id. at 625.  "Lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused."  O.C.G.A. § 51-7-43; Vojnovic at 625 (quoting Ashmore, at 231).

"Lack of probable cause shall be a question for the jury, under the direction of the court."  O.C.G.A. § 51-7-43.  Whether probable cause exists in a claim for malicious prosecution, however, is a mixed question of law and fact.  "[W]hether the circumstances alleged to show probable cause existed is a matter of fact, to be determined by the jury, but whether they amount to probable cause is a question of law for the court."  Melton v. Lacalamito, 282 S.E.2d 393, 397 (Ga. Ct. App. 1981); K-Mart Corp. v. Coker, 410 S.E.2d 425, 426-27 (Ga. 1991).  "Where undisputed facts disclose that a complaint was filed in good faith and with probable cause, summary judgment [for the defendant] is appropriate."  Id. at 454; United Baptist Church, Inc. v. Holmes, 500 S.E.2d 653, 657 (Ga. Ct. App. 1998).  To be

granted summary judgment, a defendant is not required to "prove that [the plaintiff] was guilty of criminal trespass."  Instead, the defendant only needs to show that the defendant "reasonably believed [the plaintiff] to be guilty of criminal trespass."  The burden of proof is whether a defendant "could reasonably believe [that the Plaintiff] was guilty of the crime for which he was arrested."  <u>Anchor</u>, 465 S.E.2d at 453.

Plaintiff also asserts a malicious-prosecution claim against Dantzler.  The Court first finds that Dantzler's participation in the events leading to Plaintiff's arrest was limited to the seizure of Plaintiff's firearm and the verification that it was not stolen.  The undisputed facts of his limited participation as a backup officer did not amount to the "instigation" that would cause him to be named as a "prosecutor" in a claim of malicious prosecution under Georgia law.  <u>See</u> O.C.G.A. § 51-7-46(b).  The malicious-prosecution claim against him is required to be dismissed.[14]

For the reason stated above, the undisputed facts show that Bell did not lack probable cause to arrest Plaintiff based on Hanna's report of suspicious behavior, Kimsey's statement and Bell's independent observation of Plaintiff during the

---

[14] The Court finds that Dantzler did not instigate a presentment with "malice on his part and without probable cause."  O.C.G.A. § 51-7-46(b).

investigatory detention, and the Court concludes that no reasonable juror could find that Dantzler instigated a malicious prosecution of Plaintiff.[15,16]

For the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment is required to be granted with respect Plaintiff's malicious prosecution claim.

## III.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants Adam Bell and Rodney Dantzler's Motion for Summary Judgment is **GRANTED**.

---

[15] That Bell may have mis-executed the affidavit, which cited the wrong code section, does not discredit that Bell had probable cause to believe that Plaintiff had committed the crime of criminal trespass by not leaving the Park as directed at the time Bell executed the affidavit.  Bell testified that he believed "if an authorized agent of the park asks someone to leave and [the person] refuse[s] to leave, then that constitutes criminal trespass."  [50, 58:23-59:8].  Signing a pre-printed affidavit form that invokes a different subsection of the Georiga code for criminal trespass does not negate Bell's belief that Plaintiff committed criminal trespass.

[16] An order of *nolle prosecui* does not, by itself, establish a lack of probable cause. See Lewis, 712 S.E.2d at 95 (affirming a grant of summary judgment by the trial court, which found defendants not liable for malicious prosecution despite the *nolle prosecui* order for the underlying charge of criminal trespass).  The *nolle prosecui* order also is consistent with Bell's mistake in signing the wrong affidavit form for criminal trespass.

**SO ORDERED** this 21st day of August, 2013.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE